IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED
MAR - 1 2005
CLERK, U.S. DISTRICT COURT
By _____
Deputy

| | |
|---|---|
| RYAN HEATH DICKSON, § | |
| § | |
| Petitioner, § | |
| § | |
| v. § | 2:01-CV-0095 |
| § | **Capital Litigant** |
| DOUGLAS DRETKE, Director, § | |
| Texas Department of Criminal Justice, § | |
| Correctional Institutions Division, § | |
| § | |
| Respondent.¹ § | |

### FINDINGS, CONCLUSIONS, AND RECOMMENDATION
### OF THE UNITED STATES MAGISTRATE JUDGE

This cause of action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b), implemented by an order of the United States District Court for the Northern District of Texas. The Findings, Conclusions, and Recommendation of the United States Magistrate Judge are as follows:

### I.
### NATURE OF THE CASE

Petitioner, RYAN HEATH DICKSON, a state prison inmate, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

---

¹Effective August 21, 2003, the Texas Department of Criminal Justice, Institutional Division was changed to the Correctional Institutions Division, and Douglas Dretke was named the Director. The caption is being changed pursuant to Fed. R. Civ. P. 25(d).

II.
PARTIES

Petitioner, Ryan Heath Dickson, is an inmate in the custody of the Texas Department of Criminal Justice, Correctional Institutions Division (TDCJ-CID). Respondent, Douglas Dretke, is the Director of TDCJ-CID.

III.
PROCEDURAL HISTORY

A jury convicted petitioner of the offense of capital murder, and answered the punishment special issues in a manner that caused his punishment to be assessed at death by lethal injection. *State v. Dickson*, Cause No. 38,005-A (47th District Court of Potter County, Tex. December 11, 1997). The case was appealed to the Texas Court of Criminal Appeals, and the Court of Criminal Appeals affirmed the conviction and death sentence in an unpublished opinion. *Dickson v. State*, No. 73,044 (Tex. Crim. App. April 26, 2000). Petitioner subsequently filed a state application for writ of habeas corpus on October 22, 1999. After conducting an evidentiary hearing, the trial court entered findings of fact and conclusions of law on September 22, 2000. The trial court recommended relief be granted in the form of a new trial. The Texas Court of Criminal Appeals rejected that recommendation, and, on February 21, 2001, denied relief. In the Order denying relief, the Court of Criminal Appeals adopted all findings and conclusions of the trial court except for conclusion of law number six, where the trial judge had determined harm should be presumed from the nondisclosure of tape recordings of pretrial witness interviews. The Court of Criminal Appeals then denied relief based upon its review of the case. *Ex parte Dickson*, No. 47,314-01 (Tex. Crim. App. February 21, 2001).

Petitioner then filed a federal petition for writ of habeas corpus on November 6, 2001.

Respondent filed an answer on January 28, 2002, and submitted the state court records.

## IV.
## ISSUES

Petitioner raises the following two claims:

A.  Petitioner was denied his due process rights under the Fifth and Fourteenth Amendments because the prosecution withheld prior statements made by two prosecution witnesses that constituted material impeachment evidence; and

B.  Petitioner was denied effective assistance of counsel at trial because defense counsel did not discover the existence of the statements of two prosecution witnesses which were withheld by the prosecution.

## V.
## RULE 5 STATEMENT

Respondent states petitioner has exhausted his state court remedies as to his first ground for relief, but has not exhausted his state court remedies for his second ground of relief, in which he alleges he received ineffective assistance of counsel at trial. Respondent asserts this claim is both procedurally barred and should be denied on its merits pursuant to 28 U.S.C. § 2254(b)(2). Petitioner has not filed any reply to respondent's contention that ground number two is unexhausted.

## VI.
## STANDARD OF REVIEW

The pertinent terms of the Antiterrorism and Effective Death Penalty Act of 1996 (the AEDPA), 28 U.S.C. § 2254, provide:

(d)   An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the

> adjudication of the claim –
>
> (1)   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)   resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in a State court proceeding.

28 U.S.C. § 2254(d) (2000).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001). Under the "contrary to" clause, a federal habeas court may grant the writ of habeas corpus if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-3 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of habeas corpus if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal precedent from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495 (5th Cir. 2000), *cert. denied*, 532 U.S. 949 (2001). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d

360, 363 (5th Cir.) (as modified on denial of rehearing), *cert. denied*, 531 U.S. 1002 (2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

This statute applies to all federal habeas corpus petitions which, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court. *Lindh v. Murphy*, 521 U.S. 320, 326 (1997). Resolution on the merits in the habeas corpus context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds. *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

## VII.
## FACTUAL BACKGROUND

The Texas Court of Criminal Appeals recited the following factual background in its opinion on direct appeal:

> On November 27, 1994, police were called to a small grocery store which was run by Carmelo Surace and his wife, Marie. When they arrived, officers found Carmelo shot, but alive, and they found Marie dead from a gunshot wound to the face. [ftn. Carmelo subsequently died at the hospital.] Upon interviewing people from the area, the police learned that four young men had been seen walking toward the store shortly before the police were called to the scene.
> The police subsequently identified the four young men as appellant, his younger brother Dane, Freddie Medina, and Jeremy Brown. Statements from Medina and Brown indicated that the four had planned a "beer run." When the four arrived at the Surace's store, it was determined that appellant and his brother would enter the store. At this point, appellant revealed a gun and commented that he was going to shoot the proprietors of the store. Upon entering the store, he did just that.

*Dickson*, slip op. at 2.

VIII.
EXAMINATION OF THE ISSUES

A.
*Brady* Claim

In his first ground for relief, petitioner claims the State withheld material impeachment evidence *i.e.* audiotaped recordings of pretrial interviews of two of the State's witnesses. Petitioner contends that if defense counsel had received the audiotapes of the pretrial interviews, they could have effectively impeached the witnesses' testimony at trial.

*Applicable Facts from Trial*

In the instant case, petitioner was charged with the death of Carmelo Surace alone. Accordingly, in order for petitioner to be found guilty of capital murder, the jury had to find beyond a reasonable doubt that petitioner intentionally killed Mr. Surace during the course of a robbery. In order to prove this at trial, the prosecution presented evidence that petitioner hid a sawed-off .22 caliber rifle in his jacket before entering the store (R. XXXII:161 ); shot Mrs. Surace shortly after shooting her husband as she was evidently crouched down behind the counter (R. XXX:131; R. XXXII:204); bragged about the shootings afterwards (R. XXXIII:80); showed a calm demeanor for the rest of the evening (R. XXXIII:83); admitted to the police in a taped statement he pulled the trigger and shot Mr. Surace after he (the victim) grabbed for the gun petitioner carried with him into the store (R. XLVIII:state's ex. 72A); and that he wrote a letter to his girlfriend a year and a half later stating he was a senior gang member because he had "done all the killing" he needed to do. (R. XXXII:113).

In addition to the evidence outlined above, the prosecution also offered as evidence of intent to kill Carmelo Surace, the testimony of Jeremy Brown and Freddie Medina, two of

petitioner's friends. Both Brown and Medina testified at trial that they had gone with petitioner and petitioner's brother, Dane Dickson, to the Surace store to do a "beer run," *i.e.*, grab beer and leave without paying for it. Upon arriving at the store, however, neither Brown nor Medina entered the store with petitioner and Dane. (R. XXXIII:67-9, 75, 205, 213). Medina testified at trial that, prior to anyone entering the store, petitioner had showed them his gun and was asked by Brown what he was going to do with the gun. Medina testified petitioner responded that he was going to shoot the people. (R. XXXIII:74).

Jeremy Brown testified that outside of the store, petitioner told them he was going to shoot someone, but Brown could not recall whether he saw petitioner with a gun there at the store or earlier at petitioner's house, although he had seen petitioner's gun in the past. (R. XXXIII:208-10, 234-35). The record of his trial testimony does not reflect that Brown exhibited any hesitation when testifying petitioner told him and Medina outside of the store he was going to shoot someone. (R. XXXIII: 208). Brown also testified that he and Medina told petitioner they were going to leave, and they did not enter the store with him. (R. XXXIII:213). Brown further testified that shortly after petitioner and his brother entered the store, the two brothers ran past Brown and Medina towards petitioner's house, and Brown heard someone say, "I got him" or "I shot him." (R. XXXIII:214-15). Written statements given by Brown and Medina to the police on the night of the murders contained, in essence, this same information as their trial testimony. (State's Ex. #93, 94).

The defense argued at trial that the shooting of Carmelo Surace occurred during a struggle between petitioner and Mr. Surace and that Mr. Surace's death was not an intentional murder. In

support of this defense, Dane Dickson[2] testified he saw what appeared to him to be a struggle for something between his brother and Mr. Surace prior to Mr. Surace being shot (R. XXXV:41-3). Dane Dickson denied ever hearing petitioner tell either Medina, Brown, or himself, that he was going to shoot the people in the store. (R. XXXVII:38). Moreover, in petitioner's written statement, admitted into evidence at trial, petitioner stated Mr. Surace was grabbing the gun when he shot him, and further stated he shot at Mrs. Surace because she was reaching for the telephone and would not stop doing so. (R. XXXV:238-39; State's Ex. #71). Petitioner's girlfriend testified petitioner appeared scared and fidgety when she saw him shortly after the shootings, and was "freaking out" because he had shot someone. (R. XXXII:65, 67). In his closing statement, defense attorney Gene Fristoe argued petitioner did not have the intent to kill Mr. Surace when the gun was fired. Defense counsel pointed to the statement given by petitioner in which he said Mr. Surace was struggling for the gun and also to Dane Dickson's statement, in which he mentions seeing a struggle occur between his brother and Mr. Surace. (R. XXXVIII:79). Defense counsel further suggested the only evidence of any intent to kill Mr. Surace was the testimony of Brown and Medina. Counsel attacked their credibility, pointing to differences between their written statements and between the statements and their testimony at trial on certain points. Counsel also suggested Medina and Brown had an opportunity to invent the story about petitioner telling them he was going to kill the people in the store when they were left together and unattended in a police car after being picked up after the murders. (R. XXXVIII:80-2, 84-5).

---

[2] Dane Dickson was called as a witness by both the State and by the defense in their respective cases in chief.

*Applicable Facts from State Habeas Proceeding*

Sometime after petitioner's trial, it was discovered that one of the prosecutors interviewed both Jeremy Brown and Dane Dickson in preparation for trial. It was also learned these interviews were audiotaped, but that the tapes had not been provided to the defense either before or during trial. (State Habeas Transcript, vol. 2 at 9-10, 78-9). Written transcripts of these interviews were admitted into evidence at the state habeas evidentiary hearing. (SHTr. 3:Exhibits 2B, 3B). The transcript of the pretrial interview between the prosecutor, Mr. Patrick Murphy, and Dane Dickson, reflect they discussed Dickson's earlier written statement, in which he stated he had seen petitioner shoot Mrs. Surace. During the interview, however, Dane Dickson said he was mistaken in his previous statement, that he never saw his brother shoot Mrs. Surace because he (Dane Dickson) had already turned and left the store, and he had mistakenly incorporated what his brother told him later about the shooting into his own written statement to the police. (Ex. 3B at 18-9).

During his pretrial interview with the prosecutor, Jeremy Brown initially stated he did not recall whether petitioner told him he was going to shoot the people inside of the store. Brown stated he "probably" did not say anything to petitioner before petitioner entered the store, and he did not remember the portion of his written statement in which he stated he asked petitioner whether he was going to shoot the people and petitioner answered affirmatively. Brown further stated it might have happened like it was recounted in his initial written statement, but he only vaguely recalled making the written statement. (Ex. 2B at 42-3). A short while later during this pretrial interview, after being confronted with the remainder of his prior written statement, Brown stated he did recall that petitioner had made a comment about shooting someone, either

before or after petitioner went into the store. (*Id.* at 44). Subsequently, during the same interview, Brown stated petitioner had told them "what he was going to do," even if Brown and Medina did not believe him, and that Brown knew the shooting was going to happen before petitioner entered the store. (*Id.* at 50-1). However, Brown again vacillated and stated he "thought" petitioner had told him of his intent to shoot the Suraces before entering the store. (*Id.* at 52). Later on, the prosecutor asked Brown whether he was afraid he would be prosecuted because he had taken five dollars that petitioner had stolen from the store, and Brown stated that he was still afraid. The prosecutor assured him he was not going to be prosecuted for murder for taking five dollars. (*Id.* at 59-61).

At the state habeas hearing, petitioner's trial counsel, Gene Fristoe and Greta Crofford, both testified that, had they been aware of these two audiotapes, they could have used them to impeach Dane Dickson and Jeremy Brown and help refute the State's argument that petitioner had intended to shoot the victims prior to entering the store. (SHTr. 2:11-14, 79-80). Mr. Fristoe testified he believed he could have impeached Jeremy Brown's testimony with his initial inability to remember petitioner stating he was going to shoot the people in the store. He further testified that because Brown and the prosecutor had discussed Brown's fear of being prosecuted and because the prosecutor assured him he would not be, he could have used the tape as evidence of an implied "deal" between the prosecution and Brown. (SHTr. 2:79-80). Ms. Crofford and Mr. Fristoe both testified they believed the tape of Dane Dickson's interview with the prosecutor could have aided them in the case because, in that interview, Dane Dickson spoke about the demeanor of the parties involved. (SHTr. 2:15-6, 83).

After the evidentiary hearing and subsequent oral argument, the state habeas judge issued

findings of fact and conclusions of law recommending relief be granted to petitioner based on the failure of the prosecution to provide the interview tapes to the defense at trial. Specifically, the state trial court concluded the tape of the interview of Jeremy Brown could have been used to impeach Brown's trial testimony. The state trial judge found that, for the first forty or fifty pages of the interview, Brown stated he was not certain about what petitioner had said outside the store about his intent to shoot the victims. The state habeas court also concluded defense counsel could have further impeached Brown's trial testimony because it was not until after Brown was informed by the prosecutor he would probably not be prosecuted that Brown recalled the statement of intent by petitioner outside of the store. (SHTr. 1:150-51). The state habeas court, however, declined to conclude one way or the other whether the disclosure of the tapes would have caused the jury to reach a different verdict but, nevertheless, recommended a new trial based upon maintaining the integrity of the adversarial trial process and because of the obvious import of a capital murder verdict and death sentence. (SHTr. 1:152). The Texas Court of Criminal Appeals, however, did not adopt the trial judge's recommendation, and declined to presume prejudice. After conducting its own review, the Court of Criminal Appeals denied relief. *Ex parte Dickson*, slip op. at 2.

*Applicable Law*

Under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the suppression by the State of evidence favorable to the accused and material to either guilt or punishment violates a defendant's due process rights under the federal constitutional. Under *Brady*, the prosecution has a duty to turn over to the defense both exculpatory and impeachment evidence, whether or not it was requested by the defense. *United States v. Bagley*, 473 U.S. 667,

682, 685, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Such evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Bagley*, 473 U.S. at 678.

*Analysis*

Petitioner contends a material *Brady* violation occurred in this case because, had defense counsel been aware of the pretrial interviews with Dane Dickson and Jeremy Brown, they could have impeached these witnesses with these prior statements. Petitioner further contends that, had he been able to do so, there is a reasonable probability he would not have been convicted of capital murder.

The State conceded at the state habeas proceeding that the audiotaped interviews of both Dane Dickson and Jeremy Brown were not provided to the defense.[3] Before federal habeas relief can be granted, however, it must be determined whether these interviews had any impeachment value and, if so, whether such rose to the level of "material impeachment evidence."[4]

There is no additional impeachment evidence contained in the pretrial interview with

---

[3] In addition to the Brady issue presented here, the failure of the State to produce these prior statements after the witnesses testified would be in violation of the Texas Rules of Evidence.

[4] This Court has obviously had the benefit of the transcripts of audiotapes of the pretrial interviews relative to this case. These audiotapes exist, however, only because the prosecutor decided to tape the interviews. If no audiotapes had been made, it is doubtful the "impeachment *Brady* material" identified by the state habeas trial court as having been present during the Brown pretrial interview, would ever have been discovered. In addition, the prosecutor in this case testified at the state habeas evidentiary hearing that while he did not produce the audiotapes as routine prior statements because he considered them to be work product, he would have produced them if he considered *Brady* material to be present. (SHTr. 2:101). Since witnesses rarely tell the exact same story every time they discuss an event and often fail to recall some events or the exact sequence of events, impeachment material may develop during many pretrial interviews. Indeed, if a witness were interviewed several times and related the exact same story at each and every interview without any variance, that in itself would constitute impeachment evidence, particularly in the hands of a skilled trial attorney.
    Therefore, while not before this Court in the present habeas action, there does exist some concern about *Brady* material, particularly impeachment material, which is never disclosed because no record is made and/or because the material is not perceived by the prosecutor to be *Brady* material.

Dane Dickson. In his pretrial interview, Dane Dickson stated, as he did at trial, he was mistaken in his written statement and at his plea[5] hearing when he said he saw his brother shoot Mrs. Surace before he left the store. In both the pretrial interview and at trial, Dane Dickson explained he had mistakenly incorporated what his brother told him about the shooting of Mrs. Surace into his own written statement which he gave the night of the shooting. (R. XXXV:103; SHTr. 3:ex. 3B at 19). In fact, in his direct examination of Dane Dickson during trial, the prosecutor referred to his prior conversation with Dane Dickson and the fact that during this conversation, Dickson expressed an interest in correcting his written statement on this point. (R. XXXV:102-03). For purposes of federal habeas relief, petitioner has not shown how possession of the audiotape of this prior conversation between the prosecutor and Dane Dickson would have allowed him to impeach Dane Dickson regarding the murder of Carmelo Surace. Instead, Dane Dickson's testimony regarding the shooting of Carmelo Surace was favorable to petitioner, as Dane testified he saw his brother and Carmelo Surace in what appeared to be a struggle before he heard a gun shot. The failure of the State to provide the defense with the record of the pretrial interview of Dane Dickson was not a *Brady* violation because there was no additional impeachment value to the interview.[6] Further, even if this Court assumes, for purposes of argument, there was some limited impeachment information, there is nothing which rose to the level of "materiality" to constitute prejudice.

---

[5] Dane Dickson was a juvenile at the time of the offense and was prosecuted as a juvenile. He pled guilty to the charge of capital murder in juvenile court and was sentenced to a 15-year term of imprisonment.

[6] During the evidentiary hearing at the state habeas level, trial defense counsel referred to statements made by Dane Dickson in the interview regarding the demeanor of certain people and how this would have aided in petitioner's defense had they known about these statements before trial. These general statements, however, were not expounded on by counsel at that time, petitioner's federal habeas counsel does not rely on this argument here, and this Court cannot locate any statements made by Dickson at the pretrial hearing that differed from his trial testimony in any material aspect. Accordingly, these assertions made by trial counsel have not been considered as a basis for this claim.

With regard to Jeremy Brown's pretrial interview, the fact that the prosecutor questioned Brown several times about what petitioner said outside of the store, beginning at approximately page forty-two of the transcript of the interview, and the fact that Brown did not affirmatively state petitioner told him of his intent to shoot the victims until about page fifty-two of the transcript, is information which could have been used to impeach Brown on cross-examination at trial. (SHTr. 3:ex.2B at 42-52). However, contrary to petitioner's assertion, and contrary to the trial court's findings, all discussion between Brown and the prosecutor about what petitioner did or did not say prior to entering the store occurred *before* Brown expressed fear that he was concerned he could still be prosecuted and received the assurance he would not.

In order to determine whether the nondisclosure of the interview with Jeremy Brown violated petitioner's due process rights, this Court must determine whether the information from the pretrial interview was material to petitioner's guilt. Here the materiality of the impeachment evidence hinges on whether the information was of such import that there is a reasonable probability the jury would have determined petitioner did not intentionally murder Mr. Surace had the prosecutor not suppressed the interview of Jeremy Brown. *See Williams v. Puckett*, 283 F.3d 272, 279 (5th Cir.), *cert. denied*, 537 U.S. 1010, 123 S.Ct. 504, 154 L.Ed.2d 411 (2002). A defendant must show the withheld evidence could reasonably be taken to put the case in a different light so as to undermine confidence in the verdict. *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998).

In determining the materiality of withheld evidence which impeaches a key witness's testimony on an essential fact, a federal habeas court looks to whether the testimony of the witness was strongly corroborated by other evidence. *Kopycinski v. Scott*, 64 F.3d 223, 226 (5th

Cir. 1995). Thus, the materiality of the *Brady* evidence in this case is dependant on the value of such evidence relative to the other trial evidence presented by the State. *Spence v. Johnson*, 80 F.3d 989, 995 (5th Cir. 1996).

Jeremy Brown's trial testimony is corroborated in at least three significant aspects. First, the fact that petitioner shot and killed Mrs. Surace after he shot Mr. Surace was strong evidence in support of the State's theory that he intended to shoot both victims before entering the store. There was no struggle between petitioner and Mrs. Surace, who was in a defenseless position and crouched down behind a grocery counter when petitioner shot her. The murder of Mrs. Surace was extremely relevant on the issue of petitioner's intent and on the issue of punishment.

Second, the testimony of Freddie Medina not only corroborated Jeremy Brown's testimony, but Medina's trial testimony was more detailed and was stronger. While defense counsel called into question Medina's motive for testifying at trial, Medina's testimony regarding what petitioner said about his intent to shoot the victims was consistent with his (Medina's) previous written statement to the police. In that statement, Medina stated Jeremy Brown had asked petitioner if he was going to shoot anyone and petitioner responded he was "going to shoot the two old people in the store." Therefore, even if the suppressed pretrial interview with Brown could have been used to effectively impeach his testimony at trial on this issue, it would not and does not affect the very similar testimony by Freddie Medina at trial. Medina gave detailed testimony at trial, especially regarding the circumstances under which petitioner told Medina and Brown he intended to shoot the victims. (R. XXXIII:70-81).

Next, Brown's inability to remember details of the offense during the withheld pretrial interview (which occurred approximately three years after the incident) is minimized by Brown's

statement to the police on the night of the murders which was consistent with Brown's trial testimony. In that statement, Brown said petitioner had, prior to entering the store, responded to Brown's question of whether he was going to shoot them with the answer "yeah."

The decision of the Texas Court of Criminal Appeals in determining that relief should not be granted was not unreasonable. Accordingly, the denial of this claim at the state habeas level was not an unreasonable application of the *Brady* standard. Petitioner's first ground for relief is without merit and should be denied.

### B.
### Ineffective Assistance of Counsel Claim

In his second ground for relief, petitioner alleges trial counsel were ineffective because they failed to discover the existence of the audiotaped interviews of Jeremy Brown and Dane Dickson. Petitioner contends that if defense counsel had personally interviewed Brown prior to trial, rather than instructing the defense investigator to do so, counsel would have discovered that Brown had shown diffidence in some of his testimony in a prior interview with the State. Petitioner further contends that, although lead defense counsel did interview Dane Dickson prior to trial, he was deficient in failing to discover Dane Dickson's prior interview with one of the prosecutors. Finally, petitioner asserts defense counsel were ineffective for failing to discover these prior interviews when these two witnesses were cross-examined by the defense at trial. Respondent asserts this claim is unexhausted and procedurally barred. Alternatively, respondent argues it is without merit. Petitioner has not responded to respondent's contention that this claim has not been exhausted.

### *Procedural Default*

Procedural default occurs when a petitioner fails to exhaust all available state remedies *and* the state court to which he would be required to present such claim would now find that claim procedurally defaulted. *Bledsoe v. Johnson*, 188 F.3d 250, 254 (5th Cir. 1999). In his state writ of habeas corpus, petitioner raised seven grounds for relief. While petitioner did allege his trial counsel were ineffective, none of the ineffective assistance claims involved failing to properly discover and investigate prior statements made by these two witnesses. (SHTr. 1:3-4).[7] This ineffective assistance of counsel claim was, therefore, not presented to the state courts and is an unexhausted claim.

Furthermore, were this claim to now be presented in a subsequent state writ of habeas corpus, the Texas Court of Criminal Appeals would consider the claim procedurally defaulted. Under Article 11.071 § 5 of the Texas Code of Criminal Procedure, a claim may not be raised in a subsequent habeas application unless: 1) it could not have been raised in the previous application because the factual or legal basis was unavailable at the time; or 2) the claim contains sufficient facts establishing that, but for a violation of the United States Constitution, no rational juror would have found petitioner guilty or would have answered the punishment issues in the State's favor. *See* TEX. CODE CRIM. PROC. ANN. art 11.071 § 5(a) (Vernon Supp. 1999). Clearly, the factual and legal claims presented in this ground for relief were available to petitioner at the time he filed his state habeas application. Additionally, as discussed *supra* in the first ground for relief, petitioner has presented no facts to establish that no rational juror would

---

[7]The exhaustion requirement is satisfied when the substance of the federal claim has been fairly presented to the highest state court, but it is not satisfied if the federal petition presents a new legal theory or a new factual claim. *See Whitehead v. Johnson*, 157 F.3d 384, 387 (5th Cir. 1998), *citing Picard v. Conner*, 404 U.S. 270, 275-8 (1971).

have found him guilty had counsel discovered the existence of these pretrial interviews and confronted the two witnesses with their prior statements. Because petitioner failed to exhaust his state remedies with regard to this claim, and because the Texas Court of Criminal Appeals, if presented with a successive state habeas petition on this claim, would find it barred, petitioner is procedurally barred from raising this ground for relief in the instant federal petition for writ of habeas corpus.[8]

Moreover, even if this issue were considered on its merits, it fails. The federal constitution guarantees a criminal defendant the effective assistance of counsel, and the standard used to determine whether counsel has been ineffective is enunciated in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Under the *Strickland* test, in order to prove his counsel was ineffective, a defendant must prove by a preponderance of the evidence both that counsel's performance was deficient and that this deficient performance prejudiced his defense. *Id.* at 687.

The Fifth Circuit has recognized that the materiality prong of the *Brady* standard is identical to the prejudice prong of the *Strickland* standard. *Martin v. Cain*, 246 F.3d 471 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001); *Johnson v. Scott*, 68 F.3d 106, 109-10 (5th Cir. 1995). That is, in both instances, petitioner must establish a reasonable probability of a different verdict had the alleged error not occurred. This Court has determined petitioner failed to establish a reasonable probability that, had the prosecution revealed the prior statements of Dane Dickson and Jeremy Brown to the defense, the outcome of the trial would have been different. As such, petitioner has also failed to establish a reasonable probability of a different outcome had defense

---

[8]Petitioner fails to allege, much less argue, any cause and prejudice for failing to present this claim in state court.

counsel discovered the existence of the taped interviews through their own efforts. Petitioner has failed to establish the prejudice prong of the *Strickland* standard. His second claim is without merit and should be denied.

## IX.
## RECOMMENDATION

Petitioner has failed to make a substantial showing of the denial of a federal right. The state court adjudication on the merits did not result in a decision that was contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, nor did it result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Petitioner's petition for a writ of habeas corpus should be DENIED.

## X.
## INSTRUCTIONS FOR SERVICE

The United States District Clerk is directed to send a file-marked copy of this Report and Recommendation to petitioner by the most efficient means available.

IT IS SO RECOMMENDED.

ENTERED this ____1st____ day of March 2005.

_____
CLINTON E. AVERITTE
UNITED STATES MAGISTRATE JUDGE

## * NOTICE OF RIGHT TO OBJECT *

Any party may object to these proposed findings, conclusions and recommendation. In the event a party wishes to object, they are hereby NOTIFIED that the deadline for filing objections is eleven (11) days from the date of filing as indicated by the file mark on the first page of this recommendation. Service is complete upon mailing, Fed. R. Civ. P. 5(b), and the parties are allowed a 3-day service by mail extension, Fed. R. Civ. P. 6(e). Therefore, any objections must be filed **on or before the fourteenth (14th) day after this recommendation is filed.** *See* 28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b); R. 4(a)(1) of Miscellaneous Order No. 6, as authorized by Local Rule 3.1, Local Rules of the United States District Courts for the Northern District of Texas.

Any such objections shall be made in a written pleading entitled "Objections to the Report and Recommendation." Objecting parties shall file the written objections with the United States District Clerk and serve a copy of such objections on all other parties. A party's failure to timely file written objections to the proposed findings, conclusions, and recommendation contained in this report shall bar an aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings, legal conclusions, and recommendation set forth by the Magistrate Judge in this report and accepted by the district court. *See Douglass v. United Services Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir. 1988).